It's 24-2109 United States v. Beckner Mr. Wray Good morning, your honors. My name is Marshall Wray and I am here representing the defendant and appellant, Bruce Beckner. May it please the court and also my esteemed colleague, Mr. Sullivan. And I do want to state right at the front that Mr. Sullivan and I have been in many battles together. He is an esteemed colleague of mine. We spent a lot of time in trial together. But I want to be critical of some of the prosecutorial activities at the trial court level, your honors. One of the main themes of this appeal is that in the course of the trial, the United States wanted to depend on evidence and exhibits and arguments of things that weren't crimes, that were legitimate activities, but were cast and insinuated as a way that they were. And then of other activities that would fall into the realm of 404B and should have been filtered out by Rule 403. Typically, I do not like to be standing in front of a court of appeals panel arguing discretionary evidentiary issues, given the standards that apply in those cases. But your honor, it is warranted in this case. The first significant one is, which was raised at the trial court in two separate pretrial hearings. And you can find those references in the second volume of the appeal record. First of all, around pages 26, 25, there's a discussion of it. And then later in the second, another hearing around pages 35 to 45. But your honor, there's a discussion of a transaction that had occurred, essentially a buyout. I call it the first loan or the first buyout. And that was a lawful transaction. And the government wanted to make a law about that transaction, essentially as other bad acts or as coloring Mr. Beckner. Not as a bad act, but to show who was benefiting from this transaction. It was his girlfriend who got the money. I don't think I didn't see a suggestion that that transaction in itself was corrupt or unlawful. It was just trying to show where the money went. Your honor, it is a fair point that they wanted to show where the money went. But if you look at Judge Browning's ruling, after we objected multiple times, Judge Browning said, well, here's what we're going to do. I want the government to put out a concession in its statement of the case that this is not an illegal transaction. It's not wrongdoing. And we're just putting it in to show control. That's what he wanted to do, is show control. And I think it's fair to say, as your honor stated, that the idea was also to show where some money was going. It was also intrinsic to the fraudulent scheme because part of the scheme was how that loan was refinanced.  Your honor, I would not say that it was intrinsic. Well, it was part of the scheme had to do with refinancing it. Right? There was a second refinance. That's true. This first scheme, though, your honor, the government itself conceded was not unlawful. I understand that. But it's part of the background that the jury needs to know in order to understand why they're doing these other things later as that's becoming due. It is part of the background, your honor. But the problem is that when the district court makes this ruling about how it's supposed to be used, the government then exceeds that and uses terms like skimming and other terminology. In closing argument, right? Yes, your honor. And there's no objection to any of that in the closing, nor did you brief on appeal any arguments related to the closing itself, to the closing argument as being prosecutorial misconduct. Your honor, that's a fair point about an objection at trial. So when you're sitting in trial and closing argument is happening, things are happening very quickly. And objecting to something said by the government often calls more attention in the jury's eyes to it than if you don't object to it. And, your honor, I do believe it is sufficiently briefed on this matter. I didn't use the terms prosecutorial misconduct, but we've certainly contended throughout the briefing that it was inappropriate for the prosecution to make references to it as skimming or as illegal. And, you know, particularly in closing where objections are so dangerous for the objecting party because they essentially ring a bell in the jury's mind even further and the jury goes, oh. So those are difficult trial court decisions. That's a tactical decision, strategic decision of the defense counsel whether or not to object in that circumstance. But failure to object means we have to review for plain error. It's got to be a clear error because you've made it impossible for the judge to correct the problem by not objecting. Do you agree? Your honor, I don't agree in this instance because this was an instance where we had sought and obtained a pretrial ruling. And whatever curative that could have been requested from the judge would have just been to keep calling more attention to it to the jury. So we didn't have a we didn't really have a fair curative available to us. And we had the pretrial ruling already, which the government chose not to follow. Well, you had anticipated that the prosecutor might refer to this as skimming and alerted the judge that that would be an improper way to characterize this. I'm not sure that the judge couldn't have done anything. Or one alternative is to, at the end of closing, approach the bench and say, we'd like you to instruct the jury that this was not skimming or something like that. That wasn't done, was it? No, your honor. Why are those not reasonable alternatives? Your honor, because again, those curatives make the problem worse. The jury is hearing about it more. And so, your honor. Well, I guess you could have asked for a curative instruction after. Sure, your honor. Outside of the presence of the jury. But I mean, the problem is that under the review, our standard of review, when there's no objection to closing an argument, it is in fact a plain error review. I understand that, your honor. And that that's why I just I make the point that this was this ties back to a pretrial ruling that we had sought. And then, your honor, also, even under a plain error standard, which wasn't discussed in the opening brief, your honor, and is discussed in the reply brief. Even under a plain error standard, it meets the standard of a plain error because it's so prejudicial. So if you have any other questions on that, I understand that it's a difficult issue for your honors. And like I said, I never love to be arguing those discretionary evidentiary rulings in front of you. Your honor, one other one other of those rulings that I wanted to touch on very briefly was the government's insistence on putting in evidence of the immigration. It calls it the immigration fraud scheme. And is this the sham marriage? Yes. Yeah. OK. Yeah. And the idea presented. Let me just respond to this part. How could you better show that a controls B than by B marrying A's girlfriend so she can get into the country? I mean, that's pretty good evidence that A controls B, is it not? Your honor, it's evidence definitely that there was there was some there was some family relationship and family ties there. Mr. Mr. Curtis himself, the B in that equation did not testify that he was controlled. That was contrary to his testimony. But your honor, it also is a 403 problem because it's so separate and outside of the transactions that were charged in the case. And it has a salacious flavor to it. The judge minimized the salacious flavor of it by not letting in the letter where B professes his love to this woman who's really your client's girlfriend. Your honor, minimizing wouldn't be the way I would characterize it. I think maybe he blunted it slightly, but it still is pretty salacious to put on a story. Your honor, that while I had my my sort of surrogate son marry my girlfriend so we could slip her into the country. That's that's a that's a tough allegation, judge. None of us would be proud to participate in that. But you still have to show the prejudice substantially outweighs the probing effect. And when you've done something bad, that's really probative of the charges made against you. You have a problem that you're not going to be able to resolve that you're not going to be able to rely on for reversal anyway. Well, your honor, it wasn't particularly probative, though. I mean, it's probative of the relationship with Sean Curtis. But the when you look at what the charged conduct really was all about, it was about using using your false name and concealing your past to get get all this financing. And then you had that, you know, the the the fuel factoring scheme. Sean Curtis, how important was he to all of that? Your honor, to the to the point that there wasn't other less prejudicial means to establish the control or the relationship or his willingness to go along with things. So I would say it's not particularly probative to the point where it outweighs the substantial prejudice that that's such a very salacious and quite frankly, embarrassing set piece for the trial created for Mr. Beckner. So that that would be my response to that. Your honor, I am I'm going to try to hold one minute for for rebuttal. Finally, I do want to move on to just one of the again, nobody loves to be in front of the Court of Appeals panel discussing application of enhancements on the guidelines. But your honor, there was there was one particular guideline enhancement that I wanted to highlight an oral argument, and that was the the court's application of sophisticated means. The court made a lot of the notion of offshoring proceeds and using shell companies. But your honor, the way that that application, the way that that guideline enhancement should work is that the sophisticated means are for carrying out the scheme, the conduct that the person is convicted of. And in this particular instance, you you have trial testimony that comes in and you have here. Here are some of the big set pieces at trial. As you've seen in the record, you had the loan officer from New Mexico Finance, Markita Russell, who talked a lot about this guy, Bruce Beckner, who was using the name Bill Evans. He was part of the pitch meetings and whatnot, and they obtained this very large loan, you know, $12-ish million or something like that. And that was to go into developing this place. So that's one of the major pieces that Mr. Beckner made misrepresentations that were material in the obtaining of that loan. The other set piece, the other major set piece as far as crimes that he was charged with and conduct that was considered criminal conduct, you had this fuel factoring program where, again, he's using the fake name Bill Evans. And he, along with his co-defendant, who was not enhanced with any of these same enhancements, even though he was actually hands-on running these schemes. Well, he pled guilty to a different offense. Sure, Your Honor. So, I mean, you can't compare them. Your Honor, I understand he pled guilty to a different offense. And we had some disagreements about what constituted relevant conduct. But your point is well taken. But in the end, Mr. Beckner gets enhanced for these sophisticated means where what he's doing is going out and pitching this investment program under a false name. Well, he's also hiding the proceeds in corporate shelves and offshore accounts and then using those proceeds for his personal gain, right? Your Honor, the district court referenced that some proceeds, they get moved offshore. He has a salary that's paid to a company called Top Management. And some of these proceeds go offshore. But, again, none of those are really the scheme or the illegal transaction. The problem they were having is the scheme was how they were getting money into the organization, into the fuel stop to operate it, Your Honor. And you can see in the record and in the trial record that we've cited that they really were running a – Judge Browning often calls it the Savoy scheme. It really was – they really were running a legitimate truck stop. And they were just – they had these financial problems that were, according to the trial testimony, created by, you know, these activities. Your Honor, I'm out of time. But thank you so much. Thank you. Mr. Sullivan? Mr. Sullivan? Good morning. May it please the Court. I'm Assistant U.S. Attorney Sean Sullivan. Mr. Wray is correct. We have done many battles together. In this case, he has an opportunity to go before you and point out what he sees as my errors. In our most recent trial, I don't have a chance to return the favor because he won. He got an acquittal. So he has his day in court with you on that. But it seems I never will. So to start our argument today about Bruce Beckner, Beckner was, according to the evidence, the invisible hand that controlled the truck stop. He was the only person involved, not Sean Curtis, not Arthur Herlihy, who saw the complete sight picture of the business operations and where the money from the business went. The truck stop eventually failed, and investors and lenders lost millions of dollars. On paper, it looked like it was other people's fault. The disputed evidence in this case was crucial to establish Beckner's true culpability. Mr. Wray is correct that we're talking about some discretionary evidentiary rulings at the district court by Judge Browning. And I submit to you, all of those were within the bounds of his discretion. We talked a lot, or you talked with Mr. Wray a lot, specifically about the V.R. Lee loan transaction, as well as the second piece of that. So $5 million came from V.R. Lee to Petro Fuels, the company that was owned, at least on paper, by Bruce Beckner's girlfriend, Rita Romero. And that's the one where, on the exhibit itself, the trial judge had you put to actually note for the jury that it was a legal loan, right? That's correct. I'd like to suggest we look back a little bit further for the entire chain of events that led to that evidence coming in and why it was entirely proper. Well, I think the argument really isn't about the evidence coming in. I think the argument is about how it was used in closing, is really what the brief seems to focus on. And maybe I'm missing something there. And it is true that in closing argument, there were a lot of things said that implied that that loan was somehow illegal or improper. Can you respond to that? I sure can. You're correct in the points that you're making that the evidence coming in wasn't in any way an error. And I point to, particularly because there was an accompanying exhibit, Government Exhibit 19, which was the loan documents for the transaction. That was never objected to pretrial. It just came in. We're talking about the characterization of the evidence at trial. So, during the opening statement, the prosecutors ran through the details of the transaction. And he did make that proviso, sort of like was in the evidentiary exhibit about this is not, in and of itself, unlawful. And then he did say that this would be one of many examples in the case to show where Bruce Bechner concealed important facts to serve his own interests. In this case, concealing facts from Sean Curtis about where the loan money was going, which will be very pertinent as we go on later, when the jury had to look at who was at the table for the transaction with First New Mexico Bank, with the New Mexico Finance Authority, with the individual investors. And this kind of evidence let the jury know that when you see Sean Curtis's name, it's probably Bruce Bechner who's behind it pulling the strings. To your point, Your Honor, I would direct you to the opening statement of Defense Counsel. And they talk about this transaction as well. And what they say is, this would be volume one of the record. And was this at the beginning of trial or after the close of the government's case? At the beginning of trial, opening statement. I direct you to volume one of the record, page 593 and 601. In the opening statement of defense, they talk a lot about Bruce Bechner and his sweat, equity, and all of the efforts that he put in to make the truck stop work in a legitimate fashion. That were their arguments. And they say, among other things, that $3 million of the $5 million from the VRE transaction was Bruce Bechner's investment in the truck stop. So that's obviously a mischaracterization right in the opening statement of what this transaction is about. It was a loan that had Sean Curtis's name on it, going to Bruce Bechner's girlfriend. $2 million of it being diverted to an investment account for Bruce Bechner. Then being refinanced as part of a bigger loan that was defaulted on and never repaid. So it wasn't Bruce Bechner's money. He might have put sweat equity into the business when he went to work there and presumably at some time, it's correct, he slept on the floor and he cleaned up the place and he did those things. But he didn't have the financial investment. So right away, when that said in the defense opening statement, everything the United States said after that was responsive. In particular, in the defense closing, the defense talks about how the proper term for when somebody puts their own money into a business venture that they care about is called an investment. And that's referring to this money. But that wasn't Bruce Bechner's own money. Nobody was more invested in that place than Bruce Bechner. So you'll see, especially in the government's rebuttal argument during the closing argument, we address that. And so none of this is improper argument by the United States. None of this is in violation of any of Judge Browning's pretrial rulings. It was just a reasonable response to the evidence and the commentary on the evidence as it came out throughout the trial. What about the argument that his decision to stay in Honduras is not evidence of flight because he essentially was with his, I guess, second family in Honduras? I think the way the district court approached this was correct. If you look at the transcript of the pretrial hearing on the flight evidence, the judge made it clear that this could cut both ways, you know. But the reason why he allowed the evidence in and why it was within his discretion is he talked specifically about the pattern that Bruce Bechner had prior to being served with the cease and desist order, where he would regularly travel to and from Honduras. Once he was served with the cease and desist letter and asked for his true identification, that pattern stopped. And he no longer entered the United States again until he was in custody for extradition several years later. So as the district court explained it, both sides could use that evidence in the way that they wanted. For the defense, they could point to he had longstanding ties to Honduras going back probably to around the year 2000, and that he went to Honduras because the business had now failed and he had no reason to be in America, and point out that it took a couple of months after that interaction where he was served with the cease and desist letter before he actually left. But the government on the flip side could argue it its way, which is he had a pattern of coming and going from the United States, and that suddenly stopped, and that could be flagged as consciousness of a guilt. So the evidentiary ruling was fair, and the presentation of the evidence from both parties was also fair to give an accurate picture to the jury of what was going on. I don't think there's much more to address beyond the briefing, although Mr. Ray did raise two other arguments in his presentation. And I would just say on the issue of sophisticated means, the commentary to that and the application note talks about how conduct such as offshore financial accounts is ordinarily indicative of sophisticated means, and he didn't tell you why this case is out of the ordinary. We can almost tick off every single one of those as things that happened in this case. That kind of conduct was pervasive, and it was sophisticated. As for sentencing disparities, as the court has already recognized, Mr. Beckner and Mr. Hurley, he were convicted of different offenses. But I'd also submit if you look at the Tennyson case, which is cited in our brief, it talks about how sentencing disparities and the judicial interest is in avoiding sentencing disparities nationwide. So there isn't to be undue consideration of the relationship between co-defendants in a particular case. It also says, and I don't think it says categorically this is true, but goes a long way towards saying it's almost always true, that when the district court looks at the sentencing guidelines, the particular offense level and criminal history category for a defendant, they aren't necessarily considering sentencing disparities nationwide, because everybody who's been convicted of similar conduct under similar sentences comes up with those two numbers, and they have a starting point in the guidelines and a sentencing range to begin from, and then they can look at the individual circumstances of this case. I point out both Mr. Hurley and Mr. Beckner got guideline sentences. I have a question. Between the jury verdict and sentencing, there's a 27-month delay. Was Mr. Beckner incarcerated during that time? He was. You know, he couldn't appeal until he got a final decision, and I think the Supreme Court in Betterman v. Montana has flagged that that could raise real due process. I mean, what if we were to get together and decide he's right on these issues and he gets a new trial or he's acquitted? I mean, 27 months of incarceration when he has no ability to appeal seems to me problematic. I mean, I know it's not you, but do you have any response to that? I do. I would agree with you. If you were to throw out his conviction, he could never get that time back. Right. That would be a problem. What I'm not prepared to present to you today, because I didn't anticipate this coming up, is looking at the motions to continue between the trial and the sentencing and what the reasons for those were. I think if I looked at those, I probably have better reasons than I can offer you for that. Well, it looks like it was because there was an outstanding or the judge hadn't ruled on the motions in limine. But that's what it looks like from the record. Sure. I mean, I know it wasn't raised, but it sort of was a red flag concern to me as I was reading through the briefs here. It was certainly lengthy. What I'd have to look up, but I think you can look at the briefs and see. We have three dates, right? We have the date of conviction, the date of the sentencing hearing, and the date of the judgment. My recollection is there's a substantial lag from the date of the sentencing hearing to the judgment for the judge to write on these pretrial motions. That's something that I don't think the record will tell us why that took so long. I think it's a 27-month delay between the jury verdict and sentencing.  No, jury verdict and final judgment in the case. Yes. 27 months. That comports with my recollection. I think we got to the sentencing hearing kind of in a reasonable time, but then there was quite a delay. Mr. Marshall and I had a few phone calls about that delay. I don't think we have information we can give you because we're not court staff to why that took so long. Okay. Thank you. It's not your issue. I just was concerned. If there's nothing else, I'll wrap up. Thank you. Thank you. Mr. Ray, if there's something you want to correct from him, 30 seconds. Thank you. I'll take 30 seconds. With respect to this idea of Mr. Beckner traveling back and forth and then suddenly this travel ceases, that's because he was kicked off of the truck stop by a receivership order and had no reason to come back to that place. And then with my last five seconds, this idea that Mr. Beckner didn't make any—that he had put his own investment into it, that was in response to the government's theory that all of the money from that VRE transaction got taken away, which the trial record showed that a lot of it got put back into the truck stop, Your Honor. Thank you. It's always an honor to be in this court. Thank you, counsel. The case is submitted and counsel are excused.